**SIGNED this 23rd day of December, 2014**

Marcia Phillips Parsons
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

In re

| | |
|---|---|
| JOSEPH C. PAYNE, SR. and | No. 02-22927 |
| BRENDA G. PAYNE | Chapter 11 |
| d/b/a J & J Marine Sales & Service, | |
| Debtors. | |

JOSEPH C. PAYNE, SR. and
BRENDA G. PAYNE
d/b/a J & J Marine Sales & Service,

Plaintiffs,

vs.                                                    Adv. Pro. 14-5006

FIRST COMMUNITY BANK
d/b/a Peoples Community Bank
and STEVEN C. HURET, in his
capacity as Substitute Trustee,

Defendants.

## M E M O R A N D U M

APPEARANCES:

Mark S. Dessauer, Esq.                    Steven C. Huret, Esq.
Hunter, Smith & Davis, LLP                Robert L. Arrington, Esq.
Post Office Box 3740                      Wilson Worley PC
Kingsport, Tennessee 37664                Post Office Box 88
*Attorney for Plaintiffs*                 Kingsport, Tennessee 37662
                                          *Attorneys for Defendants*

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge**.  More than eleven years after their chapter 11 plan was confirmed and their bankruptcy case closed, the Debtors Joseph and Brenda Payne have reopened the case in an effort to avoid the deed of trust held by People's Community Bank in their residence, and to modify their completed plan to treat the Bank as unsecured.  At issue primarily is whether the parties intended in the confirmed plan to substitute the Debtors' commercial property as the Bank's collateral in place of the Debtors' residence, as the Debtors claim, or whether the plan contains an scrivener's error, as the Bank responds.  If the Debtors are correct, the Bank is now unsecured because the Debtors' commercial property was foreclosed upon by another creditor in 2004.  In the event that the court decides against the Debtors on the primary issue, the Debtors have also raised two state law objections to the Bank's efforts to foreclose on the Debtors' residence, namely, that the Bank does not have a note to enforce and the Bank's deed of trust is no longer valid because it was not enforced within 10 years of the debt's maturity as required by Tenn. Code Ann. § 28-2-111.  For the reasons discussed, the court rejects all of the Debtors' claims.  The Bank's deed of trust on the Debtors' residence is enforceable and may not be avoided by the Debtors.  The following constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.  This is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(A), (K), (L) and (O).

I.

The Debtors filed a voluntary petition for bankruptcy relief under chapter 11 on September 3, 2002. At the time of their bankruptcy filing, the Debtors owned two primary parcels of real property.  One was their residence located at 229 Boone Ridge Road, Kingsport, Tennessee (the "Boone Ridge Property") and the other was their business located at 140 Spurgeon Lane, Blountville, Tennessee (the "Spurgeon Lane Property"), where the Debtors did business as J & J

2

Marine Sales & Service.

In connection with the operation of their business, the Debtors obtained a number of loans from the Bank that were secured by their Boone Ridge Property. The first was on January 27, 1997, when the Debtors executed a promissory note in favor of the Bank for an open-end credit line in the amount of $150,500, with a maturity date of January 15, 1998 (the "1997 Note"). The 1997 Note recited that the purpose of the loan was "Business: Working Capital, Line of Credit," and that security for the note was "Deed of Trust Dated January 27, 1997 On Property Located In The 18th Civil District of Sullivan County, TN." The referenced deed of trust listed the street address of the Boone Ridge Property as the property conveyed in trust, and identified Joseph and Brenda Payne d/b/a J&J Marine Sales & Service at their Spurgeon Lane Property business address as the Grantors. The Bank first recorded the deed of trust in the Sullivan County Register's Office in Blountville, Tennessee on February 6, 1997, but subsequently re-recorded the instrument on August 13, 2002, to include a legal description of the Boone Ridge Property.

On February 5, 1998, the Debtors executed a second promissory note in favor of the Bank in the amount of $147,798.18, with the loan's stated purpose being for "Business: Term Out Line of Credit" (the "1998 Note"). Unlike the 1997 Note that had required payments of monthly interest only during its approximate one-year term, the 1998 Note contained a ten-year maturity and required 120 monthly payments of $1,925.49. The 1998 Note referenced the recorded deed of trust on the Boone Ridge Property as collateral, and did not indicate whether it was a new loan or a renewal of a previous loan. However, on the same day the 1998 Note was made, the 1997 Note was stamped "paid" in the amount of $146,793.29.

Four years later, the Debtors refinanced the 1998 Note, executing a third promissory note in favor of the Bank on February 26, 2002, in the amount of $112,581.01 (the "2002 Note"). As had the two prior notes, the 2002 Note listed the deed of trust on the Boone Ridge Property as the security for the debt. The 2002 Note obligated the Debtors to make 60 monthly payments of $1,366 and one final balloon payment of $68,460.01 on March 28, 2007.

When the Debtors filed their chapter 11 petition on September 3, 2002, they scheduled the Bank as a secured creditor with a claim of $109,949.44, collateralized by the Boone Ridge Property

valued at $369,000.  According the Debtors' schedules, the Bank's lien on the Boone Ridge Property was in third place, behind Bank of Tennessee's first lien in the amount of $65,000 and a second lien in the amount of $75,000 held by Hurshel Bowers.  The Bank was also scheduled as a secured creditor on two additional obligations of the Debtors, one for $17,600 and the other for $44,861.77, respectively secured by a forklift valued at $15,000 and a 2000 Blazer bass boat and trailer valued at $11,800.[1]  As to their Spurgeon Lane Property, the Debtors scheduled the property at a value of $400,000, securing a debt to Robert Thompson in the amount of $400,915.90.  Lastly of significance, the Debtors listed three statutory liens, the first held by the Internal Revenue Service in the amount of $8,536 and the second held by the State of Tennessee Department of Revenue in the amount of $110,000, with both attached to all of the Debtors' real and personal property.  The third statutory lien was held by the Sullivan County Clerk for property taxes in the amount of $2,171 on the Boone Ridge Property.

On November 4, 2002, the Debtors filed their first disclosure statement and plan of reorganization.  In their plan the Debtors proposed to pay in full all of the mortgage debts on their real property, but cram down the two smaller secured obligations owed to the Bank, the $17,600 and $44,861.77 debts, to the scheduled values of the personal property securing each debt, $15,000 and $11,800 respectively.  The plan placed each of the three secured debts to the Bank in separate classes, with the debt secured by the forklift in Class 5, the debt secured by the boat and trailer in Class 6, and the debt on the 2002 Note secured by the Boone Ridge Property in Class 12.  The Class 5 and 6 claims were to be paid the value of their collateral over a period of 60 months with 6% interest.  Class 12 was to be paid in full with 8% interest by monthly payments amortized over a

---

[1] Consistent with the Debtors' schedules showing three secured obligations to the Bank, the Bank filed three proofs of claim.  The first was for the 2002 Note, with a balance of $110,506.90. Copies of the note and the corrected deed of trust on the Boone Ridge Property were attached.  The second proof of claim was for a balance of $18,605.53 on the forklift, with copies of the promissory note, commercial security agreement and filed UCC-1 financing statement attached, evidencing that the Bank held a perfected security interest in the forklift.  Third and last, the Bank filed a proof of claim for $46,926.93, secured by a perfected security interest in inventory including boats and trailers.  Attached to the proof of claim were copies of the promissory note, commercial security agreement, and filed financing statement.  The Debtors did not object to the Bank's claims.

4

thirty-year period, but with a ten-year maturity.[2]  As to this last class, the plan provided that a loan modification agreement would be executed to reflect the modified terms of the 2002 Note.

Because the Debtors' bankruptcy case was a small business case, the court conditionally approved the disclosure statement without the necessity of a hearing by order entered November 6, 2002, which also set deadlines for objections, scheduled a confirmation hearing and directed Debtors' counsel to serve the plan, the disclosure statement, and a ballot on all creditors.  On November 8, 2002, Debtors' counsel, who at that time was Charles Pope, filed a certificate of service evidencing that he had complied with the order, although it appears from the attachments to the certificate that what he actually served was a First Amended Disclosure Statement and a First Amended Plan.[3]  These new documents contained only minor changes not pertinent to the Bank's claims, and otherwise set forth the same payment proposal for the Bank's claims.

The Bank was represented in the Debtors' bankruptcy case by the law firm of Bearfield & McClellen, the firm the Bank regularly used for matters relating to workouts, foreclosures and bankruptcies.  Rick Bearfield, the firm's senior attorney, and his associate Jason Blackburn worked on the case.  On December 12, 2002, the firm filed an objection to the First Amended Plan on behalf of the Bank.  Specifically, the Bank objected to the Debtors' proposal to cram down the two loans secured by personal property because the loans were also "secured by a deed of trust on the Debtors' residence" by virtue of "a cross-collateralization provision in the deed of trust."  Because the proposed plan did not treat the Bank as a fully secured creditor on all three of its claims totaling $176,039.36, the Bank asserted that the plan failed to comply with 11 U.S.C. § 1129(a)(7)(A)(ii).  The objection, however, mistakenly recited that the Bank's deed of trust was "on real property at

---

[2] Despite the provision in the plan for payment of the 2002 Note as a fully secured debt, the Debtors stated in their disclosure statement that the Bank's deed of trust was subject to being set aside as a preferential transfer because the corrected deed of trust with the legal description of the Boone Ridge Property was recorded within 90 days of the filing of the bankruptcy petition.  The Debtors later retracted this statement.

[3] From a review of the court file, it appears that Mr. Pope attached a copy of the First Amended Disclosure statement as an exhibit to his certificate of service but did not attach a copy of the First Amended Plan.  Neither of the amended documents were ever filed in the bankruptcy case, despite their service on the creditors, but the documents were received as exhibits during the trial.

140 Spurgeon Lane, Blountville, Tennessee 37617," rather than the Boone Ridge Property.

A hearing on final approval of the disclosure statement and confirmation of plan along with five objections from creditors was held on December 17, 2002.  Mr. Pope and counsel for the objecting creditors, including the Bank, announced that agreements had been reached to resolve all objections and that upon the filing and service of a further amended plan incorporating those agreements, the objections would be withdrawn.  Accordingly, the court directed Mr. Pope to file and serve such an amended plan with a notice providing for any further objections.

On December 23, 2002, the Debtors filed that plan, entitled "Modifications to Amended Plan of Reorganization" (the "Modified Plan").  The Modified Plan states in the preamble on the first page that modifications to the previous plan are italicized.  One of the italicized provisions is the proposed treatment of Class 12, which states in pertinent part:

> CLASS 12     Secured claim held by Peoples Community Bank: *The three separate classes of claims of People's Community Bank are merged into one class.  It is further ordered that the Bank has an allowed secured claim of One Hundred Seventy Six Thousand, Thirty Nine and 36/100 Dollars ($176,039.36)* **which amount is secured by its deed of trust on the real property and improvement thereto located at 140 Spurgeon Lane, Blountville, Tennessee**, *the Debtors' forklift valued by the Debtor at . . . $15,000 and the 2000 Blazer Bass Boat and Trailer valued by the Debtor at . . . $11,800.* [Emphasis supplied.]
>
> *The Bank's amended secured claim is to earn interest at the contract rate of eight percent (8%) per annum, and bank is to receive monthly payments in an amount sufficient to amortize the amount of the claim over 30 years at an interest rate at 8% per annum.  The modified note will mature on January 1, 2012.  Monthly payments to the Bank will commence thirty (30) days after the confirmation of the plan and continue on the same day of each succeeding month until January 1, 2012, on which day the entire unpaid balance together with all accrued interest and other fees and expenses and charges shall be due and payable and paid in full. . . [T]he Notes shall shall continue to evidence the debt and shall remain in full force and effect.*

Attached to the Modified Plan was a Chapter 11 Plan of Reorganization Summary Sheet

6

dated December 19, 2002 (the "Summary Sheet").[4]  In contrast to the Modified Plan, which as quoted above states that the Bank's claim is secured by the Spurgeon Lane Property, the Summary Sheet lists the Bank under the Mortgages section for the Boone Ridge Property along with the Bank of Tennessee and Hurshel Bowers.  Under the Mortgages section for the Spurgeon Lane Property, only the mortgage of Robert Thompson is listed.

No objections to the Modified Plan were filed.  Accordingly, the court entered two orders on January 7, 2003, one overruling the prior objections and the second confirming the Modified Plan, of which the Modified Plan and Summary Sheet were attached and made a part (the "Confirmation Order").[5]  The clerk served the Confirmation Order upon the Debtors, all creditors and other parties in interest as required by Fed. R. Bankr. P. 3020(c)(2).  Also, Mr. Pope filed a certificate of service on January 17, 2003, indicating that he also served all parties with the Confirmation Order.  Thereafter, on February 25, 2003, the Confirmation Order was recorded in the Register's Office for Sullivan County in Blountville, Tennessee.

After confirmation, the Bank assigned a single loan number to the three loans consolidated by the Modified Plan and the Debtors made monthly payments to the Bank over the course of the next 10 years.  During that time, Mr. Thompson foreclosed upon the Spurgeon Lane Property in 2004, after the Debtors became unable to make their plan payments to him.  When the final balloon payment to the Bank required under the Modified Plan came due on January 1, 2012, the Debtors likewise were unable to make the payment.  Upon that default, Mr. Bearfield on behalf of the Bank mailed the Debtors a letter dated May 1, 2012, advising them of the Bank's intent to begin foreclosure of its deed of trust on the Boone Ridge Property.  Upon receiving this notice, the Debtors contacted Mr. Pope, who emailed Mr. Bearfield on May 7, 2012, stating that the Bank's deed of trust

---

[4] The two prior versions of the Debtors' plan also had similar summary sheets, although attached as Exhibit 2 to the Debtors' disclosure statements and referenced therein in section X.  The last summary sheet dated December 19, 2002, was stapled to the Modified Plan, presumably because no further amended disclosure statement was filed.

[5] On the day after the entry of the Confirmation Order, the Bank filed a notice stating that it was withdrawing its objection, based upon the Debtors' plan being "amended to include the following language" followed, verbatim, by the two paragraphs italicized in the Modified Plan quoted above.

against the Boone Ridge Property was to have been released under the Debtors' confirmed plan. Mr. Bearfield responded that, to the contrary, the Modified Plan contemplated that the Bank would retain its lien on the Boone Ridge Property until the Bank was fully paid.  Mr. Bearfield further stated that the Bank never had a lien on the Spurgeon Lane Property, and that it would proceed with foreclosure against the Boone Ridge Property unless the Debtors were willing to enter into a modification agreement to renew the loan to pay the balloon payment over time.  Upon receipt of Mr. Bearfield's response, Mr. Pope replied, "I agree with you and have forwarded your letter to Lee Davis who is assisting [the Debtors]."

Thereafter, the Bank scheduled a foreclosure sale on the Boone Ridge Property for March 27, 2014.  After engaging new bankruptcy counsel, the Debtors filed a motion on March 25, 2014, to reopen their chapter 11 case, for reinstatement of the automatic stay, and for a determination that the Bank was in contempt of the confirmed Modified Plan and the discharge injunction of 11 U.S.C. § 524(a).  On the same day, the Debtors commenced this adversary proceeding, requesting that the Bank be enjoined from foreclosing upon the Boone Ridge Property, that its deed of trust be avoided under 11 U.S.C. §§ 506(d), 544(a)(1), or 544(a)(3), and that the court declare pursuant to the Modified Plan that the indebtedness owed by the Debtors to the Bank is not secured by the Boone Ridge Property and that the Debtors own the property free and clear of liens.  In a subsequently filed amended complaint, the Debtors asserted that the Bank's deed of trust in the Boone Ridge Property is unenforceable because the original promissory note is marked "paid" and the Bank is unable to produce the current note, or prove that it is the holder of the note that it is seeking to enforce.  The Debtors also asserted that the Bank's deed of trust is ineffectual because the Bank failed to enforce it within 10 years of the note's maturity as required by Tenn. Code Ann. § 28-2-111(a).

The court entered an order in the bankruptcy case reopening it, while reserving for hearing the remaining relief sought by the Debtors.  The court further entered an order in this adversary proceeding temporarily enjoining the foreclosure sale pending further order.  Thereafter, the Debtors moved in their bankruptcy case to modify the confirmed Modified Plan to deem the Bank's claim as unsecured and fully satisfied by the post-confirmation payments made by the Debtors to the Bank totaling $160,085, which according to the Debtors was substantially more than the Modified Plan's required 5% dividend to unsecured creditors.

8

Although the Bank did not oppose the reopening of the bankruptcy case or the temporary injunction pending resolution of the issues before the court, the Bank opposes all relief sought by the Debtors in both this adversary proceeding and the underlying bankruptcy case. The Bank asserts that the reference in the Modified Plan to the Spurgeon Lane Property instead of the Boone Ridge Property as the Bank's collateral was the result of a scrivener's error and mutual mistake such that the court should reform the Modified Plan to correct it.  The Bank maintains further that the fact that the original note is marked paid is irrelevant since the Modified Plan created a new contract between the parties that can be traced back to the original note.   Lastly, the Bank contends that Tenn. Code Ann. § 28-2-111 does not apply in this instance and that even if it does apply, the recorded Confirmation Order fully satisfies the requirements of the statute.

A trial of this adversary proceeding, consolidated with a hearing on the contested matters in the bankruptcy case, was conducted on October 22, 2014.  In addition to the documentary evidence introduced, testimony was provided from seven witnesses: Debtor Joseph Payne; attorney Rick Bearfield; Dana Parkinson, a  former loan operations officer with the Bank; Sandra McKinney, a former personal banker at the Bank's Johnson City Sunset branch; Jonathan Davis, a former manager of the Bank at various branches; Daniel Murphy, a former branch manager of the Bank's downtown Johnson City office; and Shane Corosi, vice president and special assets manager in the Bank's credit administration department and custodian of the loan documents in this case.   Also submitted was the deposition testimony of Frank McCarver, a former senior vice president in commercial loans at the Bank.

II.

**A. <u>The Spurgeon Lane Property Reference in the Modified Plan was a Mistake</u>**

The court turns first to the issue at the heart of this case, whether the parties intended in the Modified Plan to effect a substitution of the Bank's collateral, so that its claim would be secured by the Spurgeon Lane Property rather than the Boone Ridge Property.  Courts use contract principles to interpret a confirmed plan, because the plan effectuates a new contract between the debtor and its creditors. *See In re Dow Corning Corp.*, 456 F.3d 668, 676 (6th Cir. 2006).  Because the contract

in the form of the Modified Plan was entered into in Tennessee, the laws of this state govern the plan's interpretation. *See id.; In re Lisenmeyer*, 92 Fed. App'x 101, 102 (6th Cir. 2003).

It is well established in Tennessee that courts are required to interpret a contract as it is written and cannot create a new contract for parties who have negotiated and spoken for themselves. *See Sikora v. Vanderploeg*, 212 S.W.3d 277, 286 (Tenn. App. 2006) (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975); *Petty v. Sloan*, 277 S.W.2d 355, 359 (Tenn. 1955)*; Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. App. 1999); *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. App. 1993)).  Courts may alter a written contract, however, if "both parties were operating under a mutual mistake of fact or law at the time of execution regarding a basic assumption underlying the bargain." *Id.* (citing *Alexander v. Shapard*, 240 S.W. 287, 291–94 (Tenn. 1922); *Cromwell v. Winchester*, 39 Tenn. (2 Head) 389, 390-91 (1859)).  A contract may also be modified where only one party was operating under a mistake of fact or law if that mistake was influenced by the other party's fraud. *Id.* Judicial alteration of a written agreement, known as "reformation," is an equitable remedy designed to make the contract reflect the intent of the parties. *See Lebo v. Green*, 426 S.W.2d 489, 494 (Tenn. 1968). As the party seeking to reform the Modified Plan, the Bank has the burden of proving the mistake by clear and convincing evidence. *See, e.g., Sikora v. Vanderploeg*, 212 S.W.3d at 287 (citing *Hazlett v. Bryant,* 241 S.W.2d 121, 125–26 (Tenn. 1951); *Tenn. Hoop Co. v. Templeton,* 270 S.W. 73, 75 (1925); *Sawyer v. Sawyer,* 61 S.W. 1022, 1023 (Tenn. 1901); *Bailey v. Bailey,* 27 Tenn. (8 Hum.) 230, 233 (1847); Restatement (Second) of Contracts § 155 cmt. c, at 410).

One category of mistake is in the expression of the agreement, where one or both parties believe that the contract effects the parties' intent when in fact it does not. *Sikora v. Vanderploeg*, 212 S.W.3d 287.  In such cases, the court may reform a contract to reflect the true agreement of the parties when the party seeking reformation shows:

(1) the parties reached a prior agreement regarding some aspect of the bargain;

(2) they intended the prior agreement to be included in the written contract;

(3) the written contract materially differs from the prior agreement; and

(4) the variation between the prior agreement and the written contract is not the result of gross negligence on the part of the party seeking reformation.

*Id.* "Once these elements are established, 'any discrepancy between the parties' prior agreement and their written contract is presumed to be the result of a mutual mistake.'" *Chandler v. Charleston Volunteer Fire Depart.*, No. W2011-00322-COA-R3-CV, 2011 WL 4026844, at *5 (Tenn. App. Sept. 13, 2011) (quoting *Alexander v. Shapard*, 240 S.W. at 292-93).

"Reformation is not automatically barred simply because one of the parties denies that there was an antecedent agreement or claims that the mistake was not mutual." *Id.* at 288 (citing 27 Williston on Contracts §§ 70:13, at 231, 70:21, at 258-59). *See also Chandler v. Charleston Volunteer Fire Depart.*, 2011 WL 4026844, at *5 (dismissing plaintiff's contention that reformation was improper because plaintiff intended the contract to be enforced as written). Likewise, inattention or simple negligence is not an absolute bar to reformation. *See Alexander v. Shapard*, 240 S.W. at 292; *Sikora v. Vanderploeg*, 212 S.W.3d at 289. Indeed, if inattention alone could defeat a claim for reformation, "the remedy would almost never be available to correct typographical mistakes and scrivener's errors, because parties have a duty to read the written contracts they enter into and are ordinarily charged with knowledge of their contents regardless of whether they have actually read them." *Sikora v. Vanderploeg*, 212 S.W.3d at 290. As such, courts should only deny reformation when the party's fault in causing the error "amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." *Id.* (quoting Restatement (Second) of Contracts § 157 & cmt. a, at 416). If the party seeking reformation can establish the elements of a mistake in expression by clear and convincing evidence, any difference between the original agreement between the parties and the written contract is deemed a mutual mistake. *See Alexander v. Shapard*, 240 S.W. at 292-93.

In this case, the Bank asserts that the Modified Plan's statement that its claim was secured by the Spurgeon Lane Property was a mistake caused by the misstatement in its own plan objection, which erroneously referred to its collateral as the Spurgeon Lane Property rather than the Boone Ridge Property. The Bank suggests that this mistake occurred when its attorney, in drafting the objection, inadvertently used the first address listed for the Debtors in the deed of trust, the Spurgeon Lane Property listed as the Debtors' mailing address, even though the property conveyed in trust in the document was the Boone Ridge Property. The Bank states that its position that the Modified Plan's description of its collateral was a mistake is supported by the inconsistent language in the

11

plan Summary Sheet, which it asserts correctly notes that it has a lien that continues post-confirmation in the Boone Ridge Property.  The Bank contends that it would have never agreed to a substitution of collateral because there was no equity in the Spurgeon Lane Property to support its claims.  The Boone Ridge Property, on the other hand, was worth $369,000, with first and second mortgages totaling only $140,000, such that there was substantial equity, along with the values of the personal property, to secure the Bank's three claims totaling $176,039.36.  The Bank notes that there was no evidence of any discussions regarding a substitution of collateral in its files.  Mr. Bearfield testified that there were no substitution negotiations, that he would have required any proposal from the Debtors for a substitution to be in writing, or he would have placed the proposal in writing to his client, and nothing in his file evidences any agreement to substitute the collateral. The Bank notes that the Debtors continued to make monthly payments to the Bank under the Modified Plan for 10 years, from early 2003 to 2012, even after the Spurgeon Lane Property was foreclosed on in 2004, and argues that this continued payment was inconsistent with the Debtors' assertion that the Bank's lien under the Modified Plan was only in the Spurgeon Lane Property. The Bank also introduced into evidence a copy of a receipt that it had obtained from the Debtors during discovery.  The receipt evidenced a monthly payment that the Debtors made to the Bank in April 2003.  Handwritten on the receipt were the words "House, April, 03."  The Bank contends that this receipt demonstrates that the Debtors knew that they were making payments on a debt secured by their residence, the Boone Ridge Property, rather than the Spurgeon Lane Property.

In contrast, the Debtors assert that the Plan's listing of the Bank's collateral as the Spurgeon Lane Property was no mistake.  According to the testimony of Mr. Payne, the original loan from the Bank in 1997 was for the purpose of updating the Spurgeon Lane Property, and the Debtors could not place a lien on the Spurgeon Lane Property at the time because they were only leasing it and did not acquire it until later.  Mr. Payne stated that the Debtors' intention all along was to eventually substitute the Spurgeon Lane Property for the Boone Ridge Property as the Bank's collateral, that he had discussed this intention with their bankruptcy attorney, Mr. Pope, and that the Modified Plan accurately reflected these discussions.  Mr. Payne denied ever seeing a copy of the Summary Sheet until this litigation.  Mr. Payne testified that he and his wife continued making the payments to the Bank after foreclosure of the Spurgeon Lane Property because the Modified Plan provided for these

payments to be made for 10 years, and it did not occur to them that they could stop.  As to the payment receipt with its "house" notation, Mr. Payne testified that this was not his handwriting, that his wife or daughter generally made the payments to the Bank, and that the notation could have been made by his accountant.  Regarding Mr. Pope's statement to Mr. Bearfield that his interpretation of the Modified Plan was correct, Mr. Payne testified that Mr. Pope had no authority to speak for him at the time, as Mr. Pope was not his attorney after 2003.  Lastly, the Debtors suggest that it is irrelevant that Mr. Bearfield had no knowledge of a collateral substitution.  They note that associate Jason Blackburn, who unfortunately passed away in 2009, also represented the Bank during the confirmation process.

After a careful consideration of all of the evidence, the court concludes that the clear weight of the evidence supports the conclusion that a mutual mistake occurred.  The record establishes that the first reference to the Bank having a lien on the Spurgeon Lane Property, rather than the Boone Ridge Property, was the Bank's own objection filed on December 12, 2002.  This objection states in paragraph one that "[t]he Bank is the holder of three notes secured by a deed of trust on the Debtor's residence," while paragraph two of the objection describes the 2002 Note and states that "[t]his note is secured by a deed of trust on the real property at 140 Spurgeon Lane, Blountville, Tennessee 37617."  Clearly, these two statements are inconsistent because the Debtors' residence is the Boone Ridge Property, and the Bank's deed of trust, as of December 12, 2002, was undisputedly on the Boone Ridge Property rather than the Spurgeon Lane Property.  Thus, it is beyond dispute that the Bank's objection mistakenly described its own collateral.

The evidence is also overwhelmingly clear that the mistake in the objection carried over to the Debtors' Modified Plan.  Other than Mr. Payne's self-serving testimony regarding the Debtors' intention and the one statement in the Modified Plan that "the [Bank] has an allowed secured claim of $176,039.36 which amount is secured by its deed of trust on the real property and improvement thereto located at 140 Spurgeon Lane, Blountville, Tennessee," there was no evidence of an agreement between the parties for a collateral substitution.  And contrary to the Modified Plan, the Summary Sheet for the Modified Plan prepared by Debtors' counsel identified the Bank as having a lien on the Boone Ridge Property and not the Spurgeon Lane Property.

13

There were no filings with the court that requested approval of a collateral substitution, that expressly stated that a substitution had occurred, or that otherwise placed other creditors and the court on notice that the Bank and the Debtors had agreed to a substitution of collateral. Such information would have been of great importance to other creditors because both the Internal Revenue Service and the State of Tennessee were asserting liens on the Debtors' real and personal property, Textron Financial Corporation had a judicial lien that was being stripped down from $146,576 to $10, and unsecured creditors were being paid only 5% of their allowed secured claims. A release of the Bank's secured claim on the Boone Ridge Property would have immediately made the equity in that property available for other creditors. In that case, 11 U.S.C. § 1127(c) would have required the Debtors "to comply with section 1125 . . . with respect to the [Modified Plan]" by providing "adequate information" to all creditors of this substitution, which the Debtors did not do.

Similarly, there was no proof of any communications between the attorneys or between the attorneys and their clients proposing a substitution or stating that an agreement for a substitution had been reached. Tellingly, Mr. Pope, the Debtors' own attorney during the confirmation process, did not testify. Mr. Bearfield, the Bank's attorney, did not recall a substitution and believed that one did not occur. While the Debtors suggest that Mr. Bearfield's associate Mr. Blackburn could have agreed to a substitution on behalf of the Bank and not have advised his client or Mr. Bearfield, it is simply not credible, when all of the facts are considered, that the parties would have agreed in this chapter 11 reorganization process to a substitution of collateral without any tangible writing referencing a proposal or a specific agreement for a substitution.

The conclusion that the plan provision was a mistake is also suggested by the Modified Plan's language itself, which states that the amount owed to the Bank is secured by "*its* deed of trust." [Emphasis added.] During the plan confirmation process, the Bank had only one deed of trust, and it was only on the Boone Ridge Property. Mr. Payne testified that at some point after plan confirmation he went to the Bank and executed a new note and deed of trust for the Spurgeon Lane Property, testimony that the Bank disputes. Again, other than Mr. Payne's testimony, there is no evidence of any new deed of trust or note after plan confirmation. No new deed of trust was ever recorded, and the Modified Plan did not require the execution of any new loan documents in connection with the Bank's claim. While the two earlier proposed plans provided that a loan

14

modification agreement with the Bank would be executed after confirmation, the final Modified Plan did not contain this provision.

Mr. Payne's confusion about the lien held by the Bank is demonstrated by the Debtors' verified complaints in this adversary proceeding. In both the original and amended complaints, sworn to by the Debtors, they state that their debt to the Bank at the time the bankruptcy case was filed was secured by both the Boone Ridge and Spurgeon Lane Properties, that the parties had intended for the debt to be secured only by the latter, but that when this property was damaged in a snow storm, the parties had agreed that the loan would be secured by both properties with the lien against the Boone Ridge Property to be later released. Despite this sworn statement, there was no proof at trial that the Bank ever had a lien on both parcels of realty. Further, the evidence at trial established that at the time the Bank made the first loan to the Debtors on January 27, 1997, the Debtors did not yet own the Spurgeon Lane Property.

The conclusion that the Plan language was a mistake is also confirmed by the absence of any evidence that would indicate that a collateral substitution would have been in the Bank's interest. The Debtors' schedules stated that the Spurgeon Lane Property had a value of $400,000, and that Mr. Thompson had a secured claim of $400,915.90, such that there was no equity in the realty. While the Debtors' disclosure statement stated that the Debtors had purchased the Spurgeon Lane Property for a $460,000 purchase price, that the Spurgeon Lane Property had been appraised by the Sullivan County Tax Assessor for tax purposes at $469,000, and that the balance of the indebtedness to Mr. Thompson was "approximately $400,000," this $69,000 difference would not have satisfied the amounts secured by the statutory liens of the Internal Revenue Service and the State of Tennessee that would have been prior in right to any substituted lien in favor of the Bank.

In contrast, both the Debtors' schedules and disclosure statements indicated that the Bank had a third mortgage position in the $369,000 Boone Ridge Property, behind the first two mortgages that totaled $140,000 according to the schedules, and $145,000 according to the disclosure statements. Thus, the Boone Ridge Property had, at a minimum, equity of $224,000 to secure the Bank's debt of $176,039, while the Spurgeon Lane Property had little or no equity, even without consideration of the existing statutory liens that further encumbered the property. At trial, Mr.

Payne testified that in his opinion the Spurgeon Lane Property had been worth $800,000, and that he had no role in setting the real property values in the Debtors' schedules, as Mr. Pope had advised them that he would get someone else to value the properties.  Regardless of the truth of these statements, there is no evidence demonstrating that the Bank would have known of this possible higher valuation, or that Mr. Payne's opinion of value was ever communicated to the Bank.  The Debtors' schedules, signed by them under penalty of perjury, along with their disclosure statements, listed the lower valuations previously discussed.  Similarly, there was no evidence that any appraisals were ever made of the Spurgeon Lane Property, other than the tax assessment appraisal of $469,000.[6]  Despite Mr. Payne's testimony that it had always been the Debtors' intention to substitute the Spurgeon Lane Property for the Boone Ridge Property and that the Modified Plan provision was not a mistake, the evidence was overwhelming that there was no agreement for a substitution and that the Debtors' attorney inadvertently rather than intentionally identified the Spurgeon Lane Property as the Bank's collateral in the Modified Plan.

Furthermore, the Debtors' own actions do not support their position.  The Debtors continued to pay the Bank as required by the Modified Plan for approximately eight years after the Spurgeon Lane Property was sold at foreclosure, claiming that they continued because "the plan told us to do that and we didn't know any different."  They admitted that they never sought clarification from their bankruptcy attorney Charles Pope as to whether they needed to continue paying despite the foreclosure.  It is inconceivable that the Debtors would not have contacted their attorney to inquire if they still needed to make payments after the realty was foreclosed if they honestly thought that the Bank's debt was secured only by the Spurgeon Lane Property.  The Debtors' Modified  Plan provided for a discharge of their personal liability on all of their debts upon plan confirmation, as permitted at the time by § 1141(d)(1) of the Bankruptcy Code.  Thus, once the Spurgeon Lane Property was foreclosed, there would have been no legal incentive for the Debtors to continue their payments to the Bank.  Moreover, Mr. Payne's explanation that his accountant may have written the word "house" on the payment receipt from the Bank does not discredit the writing; no explanation was given as to why his accountant would be confused regarding the purpose of the payment.

---

[6] Upon foreclosure of the Spurgeon Lane Property in 2004, Mr. Thompson was the successful bidder at $400,000 for the property.

Finally, the Bank's error in drafting the objection, which included the Spurgeon Lane Property instead of the Boone Ridge Property, did not rise to the level of gross negligence so as to bar reformation.  As discussed above, inattention alone will not defeat the Bank's argument that reformation is appropriate.  The Bank's actions must constitute "a failure to act in good faith and in accordance with reasonable standards of fair dealing." *Sikora v. Vanderploeg*, 212 S.W.3d at 290 (quoting Restatement (Second) of Contracts § 157 & cmt. a, at 416).  Nothing in this record supports a determination that the Bank acted with gross negligence.  While the error in the Bank's objection was unfortunate as it probably led to the error in the Modified Plan, there was no evidence to suggest that the errors were anything other than inadvertent.  For the foregoing reasons, the court finds that the Bank has satisfied its burden of proving that reformation is appropriate through clear and convincing evidence.  Thus an order will be entered clarifying that under the Modified Plan the Bank's claim is secured by the Boone Ridge Property.[7]

## B. <u>The Bank is the Holder of a Note that it May Enforce with its Deed of Trust</u>

The Debtors next argue that the Bank may not enforce its lien against the Boone Ridge Property, because the 1997 Note, which the deed of trust states that it secures, has been marked

---

[7] Although not addressed by the parties, there is some authority for the proposition that reformation of a confirmed plan due to mutual mistake is not permissible unless the requirements of 11 U.S.C. § 1127(b) for plan modification are otherwise met.  *See In re Daewoo Motor Am., Inc.,* 488 B.R. 418, 426-427 (C.D. Cal. 2011): *In re Logan Place Props., Ltd*, 327 B.R. 811, 812 (Bankr. S.D. Tex. 2005).  Generally speaking, this Code section limits plan modifications to the time period before the plan is substantially consummated, although in the case of an individual debtor, modification is possible even after substantial consummation as long as payments under the plan have not been completed, subject to certain conditions.  *See* 11 U.S.C. § 1127(e).  In the present case, the parties have not addressed plan modification requirements in the context of the Bank's reformation request.  Moreover, both parties agree that this court has the authority to resolve the parties' disputes, and it is well recognized that a court has jurisdiction to interpret or clarify a plan. *See Travelers Idem. Co.  v. Bailey*, 557 U.S. 137, 151, 129 S. Ct. 2195 (2009); *In re Wolverine Radio Co.*, 930 F.2d 1132, 1143-45 (1991); *In re Thickstun Bros. Equip. Co.*, 344 B.R. 515, 521-22 (B.A.P. 6th Cir. 2006).  Indeed, the Modified Plan itself provides that after confirmation this court may "so long as it does not materially or adversely affect the interests of creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan, or in the order of confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan."  Article IX of Modified Plan.  The court's ruling herein simply correcting the erroneous reference to the Spurgeon Lane Property will not affect any other creditors.

"paid."  While the Debtors concede that they signed subsequent notes, the 1998 Note and the 2002 Note, and that these notes provide that they are secured by the deed of trust on the Boone Ridge Property, the Debtors argue that this reference is insufficient because the deed of trust was never amended to reflect that it secured these additional notes. Similarly, the Debtors admit that their Modified Plan provides for payment of a secured indebtedness to the Bank, but contend that the Bank can not rely on the plan to support its claim because it has lost or has been unable to produce the promissory note that the Debtors executed after plan confirmation.  Moreover, as with the earlier promissory notes, the Debtors assert that the failure to modify the deed of trust to specifically reference the plan or the new note prevents the Bank from foreclosing on the deed of trust.  In sum, the Debtors argue that the Bank is unable to prove that it is the holder of a note that it has the right to enforce with the deed of trust.

The court disagrees.  Preliminarily,  it was not necessary for the deed of trust to have been amended in order for it to include future obligations owed by the Debtors to the Bank. The Deed of Trust is entitled "**DEED OF TRUST (With Future Advance Clause)**" and specifically defines "secured debt" to include other future obligations.  As stated in paragraph 4 of the deed of trust:

> **4. SECURED DEBT AND FUTURE ADVANCES**.  The term "Secured Debt" is defined as follows:
>
> A.    Debt incurred under the terms of all promissory notes(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. . . . NOTE IN THE AMOUNT OF $150500.00 IN THE NAME OF JOSEPH P. PAYNE AND BRENDA G. PAYNE DBA J&J MARINE SALES & SERVICE DATED JANUARY 27, 1997
>
> B.    All future advances from Lender to Grantor or other future obligations of Grantor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Grantor in favor of Lender executed after this Security Instrument whether or not this Security Instrument is specifically referenced. . . . All future advances and other future obligations are secured as if made on the date of this Security Instrument. . . .

Thus, by its terms, the  deed of trust secured not only the 1997 Note, but also all subsequent loans made by the Bank to the Debtors.

Tenn. Code Ann. § 47-50-112(b) provides:

> Any contract, security agreement, note, deed of trust, or other security instrument, in writing and signed or endorsed by the party to be bound, that provides that the security interest granted therein also secures other provisions or future indebtedness, regardless of the class of other indebtedness, be it unsecured, commercial, credit card, or consumer indebtedness, shall be deemed to evidence the true intentions of the parties, and shall be enforced as written; provided, that nothing herein shall limit the right of any party to contest the agreement on the basis that it was procured by fraud or limit the right of any party to assert any other rights or defense provided by common law or statutory law in regard to contracts.

By the enactment of this statute in 1983, the Tennessee legislature endorsed the use of dragnet and future advance clauses that had long been recognized and enforced by Tennessee courts. *See In re Lemka*, 201 B.R. 765, 767-68 (Bankr. E. D. Tenn. 1996). If the language of a dragnet clause in a deed of trust is plain and unambiguous such that a layperson can comprehend its meaning, a court must conclude that such language constitutes the parties' intention and enforce the clause. *Id.*

Applied to the case at hand, the language in the deed of trust undoubtedly meets that standard. As indicated, not only does the title of the instrument and the paragraph title for Secured Debt immediately alert a reader to the future advances provision, but the definition of secured debt also plainly and unambiguously provides that it secures future obligations of the Debtors to the Bank. Consequently, the deed of trust secured not only the 1997 Note, but also the 1998 Note, the 2002 Note that refinanced the 1998 Note, and the obligation to the Bank provided for in the Modified Plan.

Moreover, even if the deed of trust contained no future advances clause, it would still secure the debt to the Bank set forth in the Modified Plan because the plan itself expressly states that it does. Subject to certain inapplicable exceptions, 11 U.S.C. § 1141(a) provides that the provisions of a confirmed plan bind the debtor and any creditor, whether or not the creditor has accepted the plan. Subsection (d) of that same section further provides that "the confirmation of a [chapter 11] plan . . . discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). "The effect of confirmation is to discharge the entire preconfirmation debt, replacing it with a new indebtedness as provided in the confirmed plan; the plan is essentially a new and binding contract, sanctioned by the Court, between a debtor and his preconfirmation creditors." *In re Consumers Realty & Dev. Co., Inc.*, 238 B.R. 418, 425 (B.A.P. 8th Cir. 1999) (citing *In re*

*Ernst*, 45 B.R. 700, 702 (Bankr. D. Minn. 1985)).  Because of this binding effect of confirmation, the fact that the deed of trust was not expressly modified to reflect that it secured the debt set forth in the Modified Plan is irrelevant.  The Modified Plan states that the deed of trust secures the Bank's debt; that is sufficient.

There is no authority that supports the Debtors' argument on this issue, and the single case they cite, *Dickerson v. Regions Bank*, No. M2012-01415-COA-R3-CV, 2014 WL 1118076, at *8 (Tenn. App. March 19, 2014), is not on point.  *Dickerson* involved the evidence necessary to establish the existence of a lost instrument under Tenn. Code Ann. § 24-8-101, which provides that "[a]ny lost instrument may be supplied by affidavit of any person acquainted with the facts, stating the contents thereof . . . and that such instrument has been unintentionally lost or mislaid, and is still the property of the person claiming under it, unpaid and unsatisfied."  *Id.* at *12.  In *Dickerson*, the alleged assignee of the promissory note in question did not have possession of the original note or of the renewal note, and no person provided the testimony required by Tenn. Code Ann. § 24-8-101. Rather, the assignee sought to enforce the note based solely upon a copy of a change in terms agreement that referenced the renewal note.  Although the trial court held that this agreement was sufficient to establish the lost promissory note, the Tennessee Court of Appeals reversed, concluding that the agreement failed to establish the requirements of the statute, and observing that if the original note is not introduced, a satisfactory reason must be given for the failure to do so, which had not occurred. *Id.* at *14.

Unlike *Dickerson*, the present case does not involve a lost note.  Granted, the 1997 Note was marked paid,[8] but the Debtors subsequently executed the 1998 Note and the 2002 Note, and there

---

[8] While the 1997 Note did indicate that it had been paid, and Mr. Payne testified that the original note had been given to the Debtors, this evidence is not inconsistent with the conclusion that the 1997 Note was paid from the funds advanced under the 1998 Note.  Admittedly, the 1998 Note did not indicate expressly that it was a renewal or reference the 1997 Note, and Mr. Payne testified that he could have paid off the note from other funds because he had a number of loans with the Bank.  Nonetheless, the 1998 Note was signed on the same day that the 1997 Note was marked "paid," and the 1998 Note provided that its purpose was to "term out" the line of credit.  The only evidence of a line of credit in existence at that time was the 1997 Note.  Shane Corosi, vice president and special assets manager in the Bank's credit administration department, and custodian of the loan

(continued...)

was no suggestion that either of them have been lost, or that the Bank is no longer in possession of them.  In fact, a copy of the 2002 note was attached to one of the Bank's proofs of claim filed in this case.  But more significantly, the debt in question that the Bank is seeking to enforce is the debt provided for in the Modified Plan, the $176,039.36 obligation, and it is that indebtedness that the Debtors have failed to pay in full, and for which the Bank seeks to foreclose upon the deed of trust. As previously discussed, Mr. Payne testified that he and his wife executed a new note after plan confirmation, and that  when he later attempted to obtain a copy of the note from the Bank, he was told by some of its employees that the note had been lost.  According to Mr. Payne, the Debtors did not receive a copy of this new note when they signed it because they were concerned about the interest rate but were told by Frank McCarver, an employee of the Bank, to file their taxes and he could then get the interest rate reduced.

In contrast, the Bank's employees who testified expressly denied that a new note or other documents were ever executed after plan confirmation.  While the evidence did indicate that the Debtors' payments to the Bank post-confirmation were attributed to a loan number different than the 2002 Note, Bank employees Shane Corosi and Dana Parkinson testified that the new loan number was created for internal bank purposes to account for the fact that the Modified Plan had consolidated the three loans into one, rather than to reference a new promissory note.  Their testimonies were consistent with the Modified Plan that, as previously observed, did not provide for a new loan documents to be executed post-confirmation by the parties, unlike former versions of the plan.  And Mr. Payne's testimony regarding conversations with a Bank officer about getting a lower interest rate more likely occurred with respect to the earlier notes, since the Modified Plan expressly set the interest rate.  Accordingly, the court concludes that no new promissory note was executed post-confirmation.  The confirmed Modified Plan sets forth the Debtors' obligation to the Bank, and establishes that the Bank is the holder of the obligation it seeks to enforce.  Because the confirmed plan itself is sufficient proof of the debt, no separate instrument, such as a promissory note, is

---

[8](...continued)
documents at issue in this case, testified that the phrase "term out" indicated to him that the 1998 Note was used to pay off the 1997 Note and change the interest-only, open line of credit to a principal and interest closed line of credit.

required.  Moreover, the Bank's deed of trust secures that obligation, pursuant not only to the future

advances clause of the instrument, but also the express terms of the Debtors' confirmed plan.

### C. **The Bank's Deed of Trust is Enforceable**

The court turns next to the Debtors' claim that the Bank's deed of trust is no longer valid

because the Bank failed to enforce it within ten years of the maturity of the 1997 Note as required

by Tenn. Code Ann. § 28-2-111.  This statute states, in pertinent part:

> (a) Liens on realty, equitable or retained in favor of vendor on the face of the deed,
> also liens of mortgages, deeds of trust, and assignments of realty executed to secure
> debts, shall be barred, and the liens discharged, unless suits to enforce the same be
> brought within ten (10) years from the maturity of the debt.
> . . . .
>
> (c) Original liens on realty retained in favor of vendors on the face of a deed, also
> original liens of mortgages, deeds of trust, and assignments of realty executed to
> secure debts, may be extended without their priority or legal effectiveness being in
> any way impaired, for any period of time agreed upon and beyond the ten (10) year
> period from the maturity of the obligation or debt, as provided for in subsection (a);
> such extension shall be evidenced by a written instrument, which shall, prior to or
> within ten (10) years from the maturity of the obligation or debt, be duly executed
> and acknowledged and be filed for record with the register of the county in which the
> realty affected is located and be there recorded, all in accordance with the statutes
> of this state in that regard; and when so filed for record such instrument of extension
> shall be constructive notice to all persons, as provided by the registration laws of this
> state; and such instrument shall contain a brief recital of the facts with reference to
> the original lien and shall provide that the lien shall continue, for a definite period
> of time in the future, to secure the remaining obligation or debt due under and
> secured by the original lien, and it shall not be necessary that there be any increase
> or decrease in the terms of the original obligation either of principal or interest.

The Debtors observe that the promissory note specifically referenced in the Bank's deed of

trust, the 1997 Note, matured on January 15, 1998, when it was paid.  According to the Debtors,

Tenn. Code Ann. § 28-2-111(a) required the Bank to bring an action to enforce its deed of trust

within ten years after this date, or by January 15, 2008.  Because the Bank did not commence an

action during this time frame or, according to the Debtors, otherwise file for record a written

instrument that extended the 10-year limitation period in accordance with Tenn. Code Ann. § 28-2-

111(c), the Debtors conclude that the Bank's deed of trust is void and otherwise unenforceable.  The

Debtors acknowledge that their Modified Plan provides for the Bank's debt and sets a new maturity

date of January 1, 2012.  The Debtors further acknowledge that the Confirmation Order, which included the Modified Plan, was placed of record in the Sullivan County, Tennessee Register's office where the deed of trust is on file.  The Debtors argue, however, that the recorded Confirmation Order nonetheless fails to satisfy all of Tenn. Code Ann. § 28-2-111(c)'s requirements for an extension of the limitations period, and therefore was ineffective.  Specifically, the Debtors assert that their Modified Plan was not duly executed and acknowledged, that it does not contain a brief recital of the facts with reference to the original lien, and does not contain language stating that the deed of trust will continue for a definite period of time in the future.

In response, the Bank states that Tenn. Code Ann. § 28-2-111(a) is inapplicable because it pertains only to maintaining a secured creditor's priority against junior lien holders and bona fide purchasers for value.  Alternatively, the Bank contends that even if the statute is applicable to the parties of an instrument, the recorded Confirmation Order, of which the Modified Plan is a part, effectively extended the limitations period.

The Tennessee Supreme Court has stated that the purpose of Tenn. Code Ann. § 28-2-111 is to quiet title.  *See Fid. Mut. Life Ins. Co. v. Wall*, 68 S.W.2d 108, 110 (Tenn. 1934).  Therefore, in the majority of cases cited by Debtors, the courts found that the statute barred enforcement of the lien because the deed of trust at issue referenced only one note and nothing had been placed of record to put the world on notice that there was another debt secured by the deed of trust.  Consequently, the deed of trust was unenforceable not only against junior lien holders and bona fide purchasers for value, but also against the original debtor.  *See, e.g., Union & Planters' Bank v. Smith*, 64 S.W. 756, 757-58 (Tenn. 1901);  *Runnells v. Jacobs*, 45 S.W. 980 (Tenn. 1898).  Conversely, in *Fidelity Mutual Life Insurance Co. v. Wall*, the original mortgagee and the heirs of the mortgagor entered into a supplemental agreement that specifically referenced the original debt and mortgage, whereby the original debt was extended for three years and the maker was required to pay an increased interest rate.  The Tennessee Supreme Court found that the agreement was enforceable between the parties because "[t]he instrument relied upon by the complainant in the case before us as tolling the statute was, in its necessary effect, a new mortgage."  *Fid. Mut. Life Ins. Co. v. Wall*, 68 S.W.2d at 111.  The court explained that the question was "whether the supplemental agreement was effective to renew or extend the original mortgage *as between the parties themselves*,

23

so that the lien of the mortgage continued for ten years from the new date of maturity." *Id.* at 110 (emphasis added).  Indeed, the court noted that it was "not able to attach any importance to the fact that the supplemental agreement was not put on record" because such an action would have had no effect as between the parties.  *Id.*  "[A]ll instruments required by law to be acknowledged and registered are good as between the parties and their privies without acknowledgment or registration." *Id.*  In a subsequent case, the Tennessee Supreme Court elaborated on the purpose of the statute, explaining that "so long as any part of a debt secured by mortgage or trust deed remains enforceable no title is clear or quieted,–the encumbrance remains; indeed, the title is outstanding.  It was to meet this situation that the act was passed."  *Lawman v. Barnett*, 177 S.W.2d 121, 128 (Tenn. 1944).

In the present case, by its express terms the Bank's deed of trust secured not only the 1997 Note, but also all future advances and other future obligations of the Debtors to the Bank.  After setting forth the January 15, 1998 due date, the deed of trust in recognition of its dragnet provisions goes on to state in Paragraph 27 that "[t]he due date may not be more than twenty years after the date of the Secured Debt.  Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released." Thus, the parties agreed, and the world was placed on notice from the initial filing, that title would not necessarily be clear in 2008, ten years after the maturity of the 1997 Note.  Rather, because of possible future advances, the maturity date of any debts secured by the deed of trust could be up to twenty years after the January 27, 1997 date of the 1997 Note, that is January 27, 2017.  *Compare* Tenn. Code Ann. 47-28-104(a)(2) (providing that all open-end mortgages must contain a provision fixing a stated term for the duration of the open-end credit agreement, which term and any extension thereof shall not exceed a total of 30 years from the date of the original execution).

In other words, the future advances provisions of the Bank's deed of trust distinguish the present case from the cases cited by the Debtors.  According to its terms, Tenn. Code Ann. § 28-2-111(a)'s ten-year statute of limitations begins to run upon the maturity of the debt secured by the deed of trust.  In a deed of trust that expressly provides for and contemplates future advances, the debt secured by the deed of trust may actually consist of several debts.  In this case, the debt secured by the deed of trust includes the Debtors' obligation to the Bank set forth in the Modified Plan, the new obligation that was created by combining the 2002 Note with the two notes secured by personal

24

property.  The Modified Plan set a new interest rate for this debt and established a new maturity date, January 1, 2012.  Consequently, in applying Tenn. Code Ann. § 28-2-111(a), the "ten (10) years from the maturity of the debt" by which the Bank's deed of trust against the Boone Ridge Property must be enforced is January 1, 2022.

In light of this conclusion, it was not necessary for the Bank to file of record a document that met the requirements of Tenn. Code Ann. § 28-2-111(c) in order for the deed of trust to continue to be enforceable against the Debtors.  The deed of trust itself contemplated a possible maturity date of the debt of up to January 27, 2017.  And even assuming that Tenn. Code Ann. § 28-2-111(c) required the Bank to record an instrument to extend the deed of trust as to the Debtors, the court is satisfied that the recorded Confirmation Order with the Modified Plan substantially meets with the statute's requirements.  While it is true that the Debtors did not personally sign or acknowledge the Modified Plan, they were the plan proponents.  It was their plan that was confirmed and, as previously noted, they are bound by its confirmation as a matter of law.  *See* 11 U.S.C.§ 1141(a); *see also Stewart-Wright v. F.D.I.C.*, No. 3:12-00176, 2013 WL 1935508, at *3 (M.D. Tenn. May 9. 2013) (recognizing that Tenn. Code Ann. § 28-2-111(a) as a statutory limitations period is not ironclad and could be tolled or extended by the agreement of the parties).  Moreover, the recorded Confirmation Order with its attached Modified Plan and Summary Sheet more than meets the statutory requirement of "a brief recital of the facts with reference to the original lien."  The documents set forth that the Debtors are obligated to pay $176,039.36 to the Bank at an interest rate of 8% per annum, that January 1, 2012, is the maturity date of the obligation, and that the debt would be secured by the Bank's deed of trust, with the Summary Sheet listing Bank as the holder of a mortgage on the Boone Ridge Property.  Lastly, these same statements similarly indicate that the deed of trust will continue for a definite period of time in the future.  Accordingly, the Debtors' assertion that Tenn. Code Ann. § 28-2-111 precludes the Bank's foreclosure efforts is without merit.

III.

For the reasons discussed above, the court concludes that the parties intended in the Modified Plan for the Debtors' obligation to the Bank to continue to be secured by the Boone Ridge Property, and that it is in fact so secured, notwithstanding the mistake in the Modified Plan.  The

court further concludes that the Bank is the holder of the note that it is seeking to enforce under its deed of trust. Moreover, Tenn. Code Ann. § 28-2-111 is not a bar to the enforcement of the Bank's deed of trust on the Boone Ridge Property and there are no grounds for the avoidance of the deed of trust under 11 U.S.C. §§ 506(d), 544(a)(1), or 544(a)(3). In light of these conclusions, any claim that the Bank violated the discharge injunction must be rejected, as well as any efforts by the Debtors to modify their confirmed plan to pay the Bank as unsecured. There is simply no basis for the latter. Any order will be entered in accordance with this memorandum opinion denying all of the Debtors' claims in this adversary proceeding and the Debtors' pending motions in the underlying bankruptcy case. The order will further clarify that the Bank's claim is secured by the Boone Ridge Property.

# # #